J-S16017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATHAN HARRIS | : | |
| | : | |
| Appellant | : | No. 2621 EDA 2023 |

Appeal from the Judgment of Sentence Entered February 10, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0005686-2021

BEFORE:  STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED AUGUST 12, 2024**

Nathan Harris ("Harris") appeals from the judgment of sentence imposed following his convictions for possession of a controlled substance, possession with intent to deliver a controlled substance ("PWID"), and possession of drug paraphernalia.[1]  We affirm.

As Harris' sole issue on appeal concerns whether the search warrant for his residence was supported by probable cause, we review the four corners of the affidavit of probable cause in detail.  The affiant, Falls Township Police Detective John Vella, stated the following: in March 2021, New Jersey State

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(16), (30), (32).

Police ("NJSP") Trooper Mastalski[2] learned from a confidential informant ("CI") that "Dot," determined to be Harris, sold heroin from a store on Centre Street, Trenton, New Jersey. *See* Omnibus PreTrial Motion, 5/25/22, Exhibit, Affidavit of Probable Cause, 5/6/21, at 1. The store did not operate like a typical store and there was no store name on the building. *See id*. NJSP Trooper Mastalski also reported Harris' residential address to be Unit 80 of the Nolan Park Apartments in Morrisville, Bucks County, Pennsylvania. *See id*. at 2. NJSP Trooper Mastalski followed Harris from Nolan Park Apartments to his store, where he observed the CI make a controlled purchase of heroin from Harris.

In April 2021, Detective Vella began working with the NJSP's drug investigation. *See id*. at 1. Detective Vella and the NJSP arranged four additional controlled purchases between the CI and Harris in April and May 2021.[3] *See id*. at 2-5. NJSP Trooper Mastalski scheduled the first of these to occur at Harris' store, although he knew Harris often changed the location of the purchase to an area near his store. *See id*. at 2. Detective Vella and Bucks County Task Force Officers witnessed Harris leave his apartment in Morrisville and drive into Trenton. *See id*. at 3. NJSP Trooper Mastalski and

---

[2] The certified record does not indicate NJSP Trooper Mastalski's first name.

[3] We note the trial court referred to six total controlled purchases. *See* Trial Court Opinion, 1/29/23, at 2. We summarize only the four controlled purchases involving Detective Vella.

his surveillance officers picked up surveillance in Trenton and witnessed Harris sell heroin to the CI in the area of Cliff and Centre Streets in Trenton. *See id*.

The affidavit of probable cause stated that NJSP Trooper Mastalski scheduled a second controlled purchase at Harris' store. *See id*. Detective Vella and Bucks County Officers were again positioned outside of Harris' apartment but did not witness him leave his apartment. *See id*. NJSP Trooper Mastalski then notified Detective Vella that Harris was already in Trenton, and he was the passenger in a vehicle registered to someone else. *See id*. The driver went to the area of Cliff and Centre Streets. Officers observed Harris sell heroin to the CI, hand the money to the driver, and then walk to his store. *See id*.

NJSP Trooper Mastalski scheduled a third controlled purchase at Harris' store. *See id*. Detective Vella and Bucks County Officers witnessed Harris leave his apartment. *See id* at 4. While following Harris into Trenton, however, Detective Vella and the other officers lost sight of him. *See id*. Shortly thereafter, NJSP Trooper Mastalski observed Harris arrive at his store in Trenton. *See id*.

At this time, NJSP Trooper Mastalski witnessed a woman quickly enter and exit Harris' store. *See id*. Officers stopped her vehicle and recovered "two bundles of heroin, a baggie of suspected crack cocaine, and a cut straw with residue." *Id*. The woman consented to a search of her phone, which

revealed prior messages from Harris agreeing to sell drugs to her in Morrisville. *See id*. Other surveillance officers then witnessed Harris walk to the area of Lamberton and Landing Streets in Trenton, where Harris sold the CI heroin, in accordance with the controlled purchase scheduled for that day.

Next, NJSP Trooper Mastalski scheduled the fifth controlled purchase outside Harris' apartment in Morrisville. *See id*. at 5. Detective Vella and Bucks County Officers observed the CI enter the parking lot of Nolan Park Apartments and park next to Harris' vehicle. *See id*. The officers witnessed Harris exit his apartment, "go into the passenger side of his vehicle, and then go [to] the CI's car, briefly meeting with the CI before they both left." *Id*. Officers then observed Harris walk back to his apartment. The CI provided the brick of heroin he received during the transaction to the officers. *See id*.

Finally, in the affidavit of probable cause, Detective Vella stated his belief, based on his training and experience, that it is common for drug traffickers to maintain the following in their residences:

> controlled substances, books, records, receipts, notes and ledgers relative to the transportation, sale, distribution and ordering of controlled substances [and] . . . paraphernalia for cutting, packaging, weighing and distributing controlled substances. This paraphernalia includes but is not limited to: manual and electronic scales, heat sealers, [and] plastic bags including zip lock bags.

*Id*. at 5-6. Based on Detective Vella's experience, he believed there was probable cause to search Harris' residence for evidence of drug trafficking.

The magistrate court issued a warrant to search Harris' apartment. As a result of the search, the police recovered: more than eight "bricks" of heroin;

- 4 -

five "baggies" containing fentanyl; a bag containing cocaine; thirty "baggies of substances;" zip lock bags, and a digital scale. Trial Court Opinion, 6/29/23, at 2.

The Commonwealth charged Harris with drug offenses. He filed a motion to suppress the evidence found at his apartment, arguing the four corners of the affidavit of probable cause failed to establish the requisite probable cause. On February 1, 2023, the trial court heard argument from the parties and denied Harris' motion to suppress.[4] The charges then proceeded immediately to a stipulated waiver trial, where the parties agreed to the introduction of the same evidence presented at the suppression hearing.

The trial court found Harris guilty of possession of a controlled substance, PWID, and possession of drug paraphernalia. On February 10, 2023, the trial court imposed an aggregate sentence of five and one-half to eleven years' imprisonment. Harris filed a post-sentence motion, which the trial court denied.[5] He then filed a notice of appeal *nunc pro tunc*. Both he and the trial court have complied with Pa.R.A.P. 1925(b).

_____

[4] At the same hearing, the trial court also heard testimony and argument on Harris' pretrial Pa.R.Crim.P. 600 motion to dismiss the charges for an alleged violation of his speedy trial rights. The trial court denied relief on this claim.

[5] We summarize that Harris' post-sentence motion, filed by his trial counsel, Sara Webster, Esquire, was untimely. *See* Pa.R.Crim.P. 720(A)(1) (providing that a post-sentence motion shall be filed no later than ten days after sentencing). Attorney Webster then filed a notice of appeal, at Superior Court Docket 1138 EDA 2023. This Court issued a *per curiam* rule to show cause,
*(Footnote Continued Next Page)*

Harris presents one issue for our review: "Did the trial court err in denying [Harris'] omnibus [pretrial] motion to suppress where the search warrant for [his] residence was not supported by probable cause?" Harris's Brief at 9 (unnecessary capitalization omitted).

Harris argues that the trial court erred in denying his suppression motion, where the affidavit of probable cause did not establish probable cause to search his residence. Our standard of review with respect to a suppression ruling is limited to determining:

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

---

which pointed out the appeal may be untimely, notwithstanding the untimely post-sentence motion, because it was filed more than thirty days after sentencing. *See* Pa.R.Crim.P. 720(A)(3) (providing that if the defendant does not file a timely post-sentence motion, a notice of appeal shall be filed within thirty days of sentencing). Harris' present attorney, Christa Dunleavy, Esquire, withdrew the appeal on July 21, 2023, and then filed an unopposed Post Conviction Relief Act petition, seeking reinstatement of Harris' direct appeal rights *nunc pro tunc*. *See* 42 Pa.C.S.A. §§ 9541-9546. The trial court granted relief, and we now consider Harris' arguments on appeal.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (citations and quotation marks omitted). Our scope of review "is confined primarily to questions of law." *Commonwealth v. Smith*, 784 A.2d 182, 185 (Pa. Super. 2001) (citations omitted). We review only the record that existed at the time of suppression ruling. *See Commonwealth v. Davis*, 241 A.3d 1160, 1171 (Pa. Super. 2020).

The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution both require a search warrant to be supported by probable cause. *See Jones*, 988 A.2d at 654. When reviewing an application for a search warrant, the task of the issuing magistrate is to make a common-sense decision whether, considering all the information in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *See Smith*, 784 A.2d at 185 (citations omitted). A finding of probable cause must "be based on facts described within the four corners of the affidavit." *Id*. (citations omitted).

Pennsylvania courts employ a "totality of the circumstances approach" to determine whether a request for a search warrant under the Fourth Amendment is supported by probable cause. *Commonwealth v. Gray*, 926 (Pa. 1985). Our Supreme Court has stated:

> Pursuant to the "totality of the circumstances" test . . . the task of an issuing authority is simply to make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . It is the duty of a court reviewing an issuing authority's

probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

＊ ＊ ＊ ＊

[Further], a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

***Jones***, 988 A.2d at 654 (citation omitted).

This Court has held that "probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." ***Commonwealth v. Mendoza***, 287 A.3d 457, 462 (Pa. Super. 2022) (citations omitted). The affidavit of probable cause must have established a "substantial nexus" between the specific location and the criminal activity described. ***Id***. The duty of this Court is to ensure that this nexus existed. ***See id***.

We note that in this appeal, the parties address ***Commonwealth v. Nicholson***, 262 A.3d 1276 (Pa. Super 2021), and ***Commonwealth Kemp***, 195 A.3d 269 (Pa. Super. 2018).

In ***Nicholson***, the affidavit of probable cause for a search warrant for Nicholson's residence stated the following: a CI reported to the police that Nicholson was selling controlled substances, driving a blue Dodge Caliber, and residing at a certain address. ***See Nicholson***, 262 A.3d at 1278. The police

worked with the CI to coordinate two controlled purchases. *See id*. During the first controlled purchase, the police did not have surveillance on Nicholson before the drug transaction; they only observed him sell the drugs, then directly drive home and enter his residence. *See id*. at 1278-79. In the second purchase, the police observed Nicholson: leave his residence; make two stops — one at the post office and the other at a location the officer "could not identify;" conduct the controlled purchase with the CI; and then directly return to his residence. *See id*.

Based on these facts, this Court held that the affidavit of probable cause was insufficient to support probable cause to search Nicholson's residence. We reasoned that "while Nicholson returned to his residence after each drug sale, that does not alone support a probable cause determination justifying a search of his home." *Id*. at 1280-81. We held that the lack of evidence as to "where Nicholson came from" before the first controlled purchase, as well as the evidence that he made two stops prior to the second purchase, indicated he could have obtained the contraband from somewhere other than his residence or that he kept it in his vehicle. *Id*. at 1281. We held that "[i]t does not logically follow that Nicholson had the drugs stashed at his home just because he went there after each sale was completed." *Id*.

In *Kemp*, the affidavit of probable cause for a search warrant for Kemp's home stated the following: a CI reported to the police that Kemp had been selling marijuana to him for years. *See Kemp*, 195 A.3d at 272-73. Through

prior contact, the police knew Kemp and where he resided. *See id*. The police coordinated two controlled purchases with the CI, in which the police observed Kemp: leave his residence; enter his vehicle; proceed directly, without making any stops, to the controlled purchases; and conduct the transactions. *See id*. Based on the facts in the affidavit of probable cause, this Court determined there was a substantial nexus between Kemp's residence and the criminal activity to justify the issuance of a search warrant for Kemp's residence. *See id*. at 275.

The *Kemp* Court also reasoned that the Pennsylvania Supreme Court decision in *Commonwealth v. Clark*, 28 A.3d 1284 (Pa. 2011), was "directly on point." *Kemp*, 195 A.3d at 276. We note that in *Clark*, the affidavit of probable cause to search Clark's residence stated that the police witnessed Clark depart from his residence, enter his vehicle, drive to the location of a controlled purchase, sell cocaine to a CI, and directly return to his residence. *See Clark*, 28 A.3d at 1285. The *Clark* Court held that Clark leaving his residence and proceeding directly to the drug transaction "certainly connected the illegal transaction to [Clark's] residence." *Id*. at 1291. Additionally, the Court held:

> Although the circumstances . . . also potentially pointed to [Clark's] vehicle as a storage location for the drugs, the law does not require that the information in a warrant affidavit establish with absolute certainty that the object of the search will be found at the stated location, nor does it demand that the affidavit information preclude all possibility that the sought after article is not secreted in another location, nor does it demand that the

affidavit information preclude all possibility that the sought after article is not secreted in another location. . . .

*Id*. (citation and quotation marks omitted).

Harris argues that the trial court erred by denying his motion to suppress evidence found in his apartment, where the search warrant was not supported by probable cause. *See* Harris's Brief at 9. Relying on this Court's ruling in *Nicholson*, and focusing on the facts surrounding the drug transactions in Trenton, Harris contends that merely returning to his apartment after each drug transaction did not give rise to probable cause to search his residence. *See id*. at 14-15. Harris avers that any probable cause that he committed a crime on the street did not necessarily give rise to probable cause to search his residence. *See id*. at 17-20 (arguing, *inter alia*, that "[a]ll but one of the transactions occurred at or near [Harris'] store in Trenton, New Jersey"). Harris concedes there was probable to search his store and vehicle, but contends the only nexus between his residence and the crimes committed was the fact that he lived at the apartment.[6] *See id*. at 20-21.

The trial court held the affidavit established sufficient evidence to support probable cause to search Harris' residence. The trial court

---

[6] Harris also briefly argues the trial court's reliance on information from the CI was misplaced, where there was no indication of the CI's reliability and the CI had a prior criminal history. *See* Harris' Brief at 24. However, Harris does not elaborate further on this issue, nor cite any legal authority in support. We thus do not address these statements. *See* Pa.R.A.P. 2119(a) (requiring argument to include discussion and citation of authorities as are deemed pertinent).

- 11 -

emphasized the particular circumstances of the last controlled purchase, in the parking lot of Harris' residence: "after the last controlled buy [Harris] proceeded directly back into the apartment and did not stop at his vehicle, which clearly established probable cause to search the residence for currency and drug dealing paraphernalia because of the unlawful proceeds." Trial Court Opinion, 6/29/23, at 12.

Additionally, the trial court considered the other evidence in the affidavit of probable cause, including "the [CI's] information, the surveillance of [Harris, and his] consistent travel directly from his home to the store in New Jersey where he sold drugs." *Id*. Considering the totality of the circumstances, the trial court found the magistrate court properly found there was probable cause that the following would be found in Harris' residence: (1) controlled substances; (2) paraphernalia; (3) the means and instrumentalities utilized in distribution of controlled substances; and (4) United States currency that had been acquired in the final transaction in Harris' apartment building's parking lot. *See id*. at 13; *see also* N.T., 2/1/23, at 81 (trial court holding it will give deference to the magistrate court and deny Harris' motion to suppress). Thus, the trial court held there was sufficient probable cause for the issuance of the search warrant for Harris's residence and denied his motion to suppress.

We conclude that the trial court's factual findings are supported by the suppression record and the legal conclusions drawn therefrom were proper.

- 12 -

*See Jones*, 988 A.2d at 654. We emphasize, as did the trial court, that in the final controlled purchase, conducted in the parking lot of Harris' apartment building, officers observed Harris: (1) leave his residence; (2) briefly stop at his car; (3) proceed to the CI's car, which was parked next to Harris' car, and conduct the drug transaction; and (4) then return directly to his apartment without stopping at his car. The trial court found these facts established probable cause to search the residence for currency or unlawful proceeds of this last drug buy. *See* Trial Court Opinion, 1/29/23, at 12. Notably, on appeal Harris does not dispute this reasoning. In the absence of any discussion by Harris, we do not disturb this finding. *See Commonwealth v. Walker*, 954 A.2d 1249, 1255 (Pa. Super. 2008) (*en banc*) (stating "[t]his Court is an error correcting court; it is not an error-finding court").

Furthermore, contrary to Harris' argument, we conclude these facts are distinguishable from those in *Nicholson*. In *Nicholson*, although police officers observed Nicholson return directly home *after* each drug transaction, there was no evidence as to where he "came from" *before* the first controlled purchase, and there was evidence he made two stops prior to the second purchase, one of which the officer "could not identify." *Nicholson*, 262 A.3d at 1280-81. This Court held that under these facts, it was "just as likely that [Nicholson] picked up the contraband from somewhere other than his own residence [or] kept the drugs in his vehicle, where the sale took place." *Id*. at 1281. Here, Officer Vella and officers observed Harris: walk out of his

- 13 -

apartment, go to his car; stop briefly at the CI's car, which was parked next to his; and return directly home, without stopping at his car.

On the other hand, we conclude the instant facts are analogous to those in **Kemp** and **Clark**. In **Kemp**, the police officer observed Kemp twice leave his residence, enter his car, **make no stops** on his drive to conducting the controlled drug buy with the CI. **See Kemp**, 195 A.3d at 273. This Court concluded these facts established a nexus between Kemp's home and the crime. **See id**. at 275. In **Clark**, police officers observed Clark leave his residence, enter his car, drive to the site of the controlled drug buy and conduct the transaction, return directly home, exit his car, and enter his residence. **Clark**, 28 A.3d at 1285. Our Supreme Court similarly held that these facts connected the illegal transactions to Clark's residence "and permitted the issuing authority to conclude that drugs would likely be found in the residence." **Id**. at 1291.

Again, here, the police officers observed Harris walk out of his apartment, stop at his car, conduct the controlled drug buy with the CI, at the CI's car, which was parked next to his, and then directly walk back to this apartment, without making any stops. These facts support the trial court's findings that there was a substantial nexus between Harris' crimes and his residence, and thus there was probable cause to search the residence for currency and unlawful proceeds. **See Mendoza**, 287 A.3d at 462; **see also** Trial Court Opinion, 6/29/23, at 12.

- 14 -

We do not conduct a *de novo* review of the issuing authority's probable cause determination, but review whether there was substantial evidence in the suppression record supporting the decision to issue the warrant. **See Jones**, 988 A.2d at 654. After reviewing the affidavit of probable cause and the totality of the circumstances, we conclude that the trial court did not err in upholding the magistrate court's issuance of the search warrant for Harris' residence.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/12/2024