J-S44036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HALEY ANN REISEG | : | |
| | : | |
| Appellant | : | No. 597 EDA 2025 |

Appeal from the Judgment of Sentence Entered November 4, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004282-2023

BEFORE:  LAZARUS, P.J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED MAY 21, 2026**

Haley Ann Reiseg ("Reiseg") appeals from the judgment of sentence entered following a stipulated non-jury trial at which the trial court found her guilty of aggravated assault by vehicle and driving under the influence (presence of controlled substance) ("DUI").[1]  Reiseg challenges the trial court's denial of her motions to suppress evidence obtained under a search warrant for her medical records and second search warrant for the seizure of her blood samples after the trial court excluded references to contraband found in her vehicle.  We affirm.

_____

[1] **See** 75 Pa.C.S.A. §§ 3732.1(a), 3802(d)(1)(ii).

Although the notice of appeal spelled appellant's last name as "Reisig," the record more consistently uses the spelling "Reiseg."  We have amended the caption of this appeal to use the latter spelling for the purpose of consistency.

The trial court summarized the factual and procedural background of this appeal as follows:

On August 12, 2022 at approximately 4:30 p.m., [Reiseg] was driving a Hyundai Sonata vehicle [with a passenger, Dominick Aquino,] westbound on East Philadelphia Avenue in Douglass Township, Montgomery County when she drifted into the opposing[] eastbound lane and struck a Toyota Rav-4 vehicle head-on. . . . The Rav-4 was occupied by the driver[, Marian Kidd ("Kidd"),] and her two minor grandchildren. Patrol Officer Daniel Castellucci [("Officer Castellucci")] of the Douglass Township Police Department responded to the scene and observed the two vehicles with heavy front-end damage and airbags deployed. The officer observed a registered nurse attending to [Reiseg]. . . .

[Kidd] reported to Officer Castellucci that she was driving at a normal rate of speed, travelling eastbound of Philadelphia Avenue, when the Hyundai, travelling in the opposite direction, drifted from its lane of travel into her lane. She tried to avoid the collision, but was struck head-on by the Hyundai. The collision caused the Toyota to spin out of control, ultimately landing in the front yard of 1760 E. Philadelphia Avenue. . . . [Kidd] sustained serious injuries requiring surgery.

Officer Castellucci observed [Reiseg]. He noted that she had disheveled clothing, poor personal hygiene and she was unable to recall details of what happened before and after the crash. She [stated she] had fallen asleep, which Officer Castellucci had noted was unusual at 4:30 p.m. Officer Castellucci tried to locate [Reiseg's] insurance documentation. The passenger of [Reiseg's] Hyundai directed him to the center console of the vehicle, but the officer was unable to locate insurance documents in that location. [Reiseg] and [her passenger] were both loaded into ambulances.

While [Reiseg] was in the ambulance, Officer Castellucci had a conversation with her. She told the officer that she was headed to Walmart in Pottstown. On her way to the Walmart, she stopped in the parking lot of the Weis [s]upermarket because she was tired and unaware of where she was. She wanted to stop driving because she was so tired. She described holding . . . her passenger's hand because she was so tired. She explained that she woke up to the smell of airbags and people running toward her vehicle. She had no recollection of falling asleep at the wheel.

Given the fact that [Reiseg] had sustained injuries as a result of the collision, Officer Castellucci did not attempt to perform any field sobriety tests.

After the conversation with Officer Castellucci, [Reiseg] was transported to Lehigh Valley Hospital [("the hospital")] for medical examination, testing, diagnosis and treatment. Officer Castellucci remained at the scene to photograph the vehicle and document the scene. The officer began to search the Hyundai to locate [Reiseg's] insurance information. The front passenger seat was pushed back to the farthest position, and the officer tried to move the seat forward so he could see underneath it. There was a walking cane blocking the seat mechanism, so the officer moved the cane. After moving the cane, the officer found a small plastic baggie under the seat containing a clear crystal substance that he recognized as suspected methamphetamine.

* * * *

Based on [Officer] Castellucci's training and experience at the time of the crash, he knew that individuals experiencing the end of a methamphetamine high may get extremely lethargic after being awake [for] extended periods of time. Based on [Officer] Castellucci's training and experience and his observations of [Reiseg], he believed that her disheveled clothing, poor hygiene, inability to recall and extreme lethargy were signs of methamphetamine use.

Trial Court Opinion, 4/21/25, at 1-4.

In September 2022, Detective Robert B. Evans ("Detective Evans") applied for, and obtained, a search warrant, the first, to obtain Reiseg's medical records from her stay at the hospital ("the records warrant"). Detective Evans received Reiseg's medical records, which contained information: (1) her urine sample was positive for methamphetamine and amphetamines; (2) she reported using methamphetamines two to three times per week for about one year; and (3) she had not slept for multiple days due to prolonged methamphetamine use. In October 2022, Detective Evans

applied for, and obtained, a second search warrant for Reiseg's blood samples taken during her treatment at the hospital ("the blood warrant"). Detective Evans received Reiseg's blood samples from the hospital and delivered them to NMS Laboratories ("NMS") for testing. The results of the testing on the blood samples were positive for methamphetamines and amphetamines. The affidavits of probable cause for the records and blood warrants both referenced Officer Castellucci's discovery of the bag of methamphetamines in Reiseg's vehicle.

After the filing of charges, which included aggravated assault by vehicle while DUI,[2] Reiseg filed motions to suppress the bag of methamphetamines Officer Castellucci found in her vehicle, as well as all evidence obtained pursuant to the records and blood warrants.[3] Following a hearing and the consideration of subsequent briefs, the trial court suppressed the bag of methamphetamines found in Reiseg's vehicle. *See* Order, 5/6/24, at 7-8.[4] The court denied the remaining suppression motions.

The Commonwealth subsequently amended the count of aggravated assault by vehicle while DUI to aggravated assault by vehicle, and the court found Reiseg guilty of aggravated assault by vehicle and DUI at a stipulated

_____

[2] *See* 75 Pa.C.S.A. § 3735.1(a).

[3] Reiseg did not challenge the validity of the blood draw at the hospital.

[4] The trial court determined that Officer Castellucci's discovery of the bag of methamphetamines was the product of a warrantless search that did not fall under the community caretaking or plain view exceptions to the warrant requirement. The Commonwealth has not challenged this ruling.

non-jury trial. On November 4, 2024, the court sentenced Reiseg to an aggregate term of three to twenty-three months of imprisonment followed by two years of probation. Reiseg timely filed a post-sentence motion, which the court denied. Reiseg did not timely appeal, but the court subsequently granted her timely Post Conviction Relief Act ("PCRA") petition to reinstate her direct appeal rights.[5] Reiseg timely filed a notice of appeal *nunc pro tunc*, and she and the trial court complied with Pa.R.A.P. 1925.

Reiseg raises the following issues for review:

I. Did the lower court err failing to suppress the following as the fruit of the illegal search of [her] vehicle:

a. The results of the search of [her] medical records, in that, when the results of the illegal search of [her] vehicle are excised from the affidavit of probable cause for [her] medical records, the affidavit fails to set forth sufficient facts to establish probable cause to search the records.

b. The results of the seizure of [her] blood samples, in that, when the results of the illegal search of [her] vehicle are excised from the affidavit of probable cause for defendant's blood samples, the affidavit fails to set forth sufficient facts to establish probable cause to recover the blood samples.

c. The results of the forensic analysis of [her] blood, in that, insufficient probable cause existed for the analysis when facts pertaining to the illegal search of [her] vehicle are not considered?

\* \* \* \*

II. Did the lower court err in failing to suppress the results of the forensic analysis of [her] blood, in that, investigators failed to obtain a separate search warrant requesting permission to perform a forensic analysis of [her] blood after her blood samples had been recovered from the hospital?

_____

[5] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

Reiseg's Brief at 4-5.

In her first issue, Reiseg challenges the trial court's ruling that there was probable cause to issue the records and blood warrants after excluding the references to the bag of methamphetamines Officer Castellucci found in her vehicle. *See* Reiseg's Brief at 11.

We initially note our well-settled standard of review when reviewing the denial of a suppression motion.

> Our standard of review . . . is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. . . . If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Gindraw*, 297 A.3d 848, 851 (Pa. Super. 2023) (citation omitted).

Regarding the probable cause requirement for search warrants, our Supreme Court has explained:

> The Fourth Amendment to the United States Constitution commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." . . . Similarly, Article I, Section 8 of the Pennsylvania Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

*Commonwealth v. Jacoby*, 170 A.3d 1065, 1081 (Pa. 2017).

- 6 -

The following law applies to the issuing authority's determination of whether an affidavit contains sufficient probable cause:

> It is well-established that a magistrate may not consider any evidence outside of the affidavit to determine whether probable cause exists to support a search warrant. [B]efore an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search . . .. [S]uch information must be viewed in a common sense, nontechnical, ungrudging and positive manner . . ..
>
> The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Commonwealth v. Mendoza*, 287 A.3d 457, 462 (Pa. Super. 2022) (internal citations, quotations, and brackets omitted).

A reviewing court is not to conduct a *de novo* review of the issuing authority's probable cause determination; instead:

> [It] is simply to determine whether or not there is substantial evidence in the record supporting the decision to issue a warrant . . .. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.
>
> Thus, although reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, the deference afforded a magistrate judge ensures that, if a substantial basis exists to support the magistrate's probable cause finding, the [suppression] court must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant.

*Id*. at 463 (internal citations, quotations, and brackets omitted; some ellipses in original); *see also id*. at 462 (noting that "probable cause is based on a probability, not a *prima facie* case of criminal activity"); ***Commonwealth v. Rapak***, 138 A.3d 666, 672 (Pa. Super. 2016) (stating "affidavits of probable cause [for search warrants] are subject to a much less rigorous standard than those governing evidence and burdens of proof at trial").

As to Reiseg's challenge to the records warrant, she suggests that while the affidavit of probable cause established an accident had occurred, it did not "establish the existence of a crime." *See* Reiseg's Brief at 17. In support, she discusses ***Commonwealth v. Lenhart***, 553 A.2d 909 (Pa. 1989), to claim that falling asleep while driving was insufficient to show intoxication played a role in the crash. *See id*. at 17-18. Furthermore, Reiseg contends the affidavit lacked proper factual bases to support Officer Castellucci's belief methamphetamines played a role in the crash. *See id*. at 18-19.

The trial court determined substantial evidence supported the magisterial district judge's decision to issue the records warrant even without reference to the bag of methamphetamines in Reiseg's car. *See* Trial Court Opinion, 4/21/25, at 15. The court summarized the contents of the affidavit of probable cause, including the summary of Officer Castellucci's training and experience, his interactions with Reiseg at the scene of the crash, his belief that Reiseg and her passenger were at the end of methamphetamine highs due to Reiseg's extreme fatigue, inability to recall the events preceding the accident, as well her and her passenger's personal appearances, including

their disheveled clothing and poor hygiene. *See id*. at 13-14. The court concluded the affidavit established a nexus between the crimes under investigation and the search of Reiseg's medical records. *See id*. at 14.

We conclude Reiseg's arguments do not support reversing the trial court's decision to uphold records warrant, but on different grounds than stated by the trial court. *See Commonwealth v. Ani*, 293 A.3d 704, 729 (Pa. Super. 2023) (noting that "[a]s an appellate court, we may affirm on any legal basis supported by the certified record") (internal citations and quotation marks omitted). Our review begins with the relevant portions of the affidavit of probable cause, absent the reference to Officer Castellucci's discovery of the bag of methamphetamines in Reiseg's car:

> Officer Daniel Castellucci badge 36, is a sworn police officer with the Douglass Township Police Department in Montgomery County, Pennsylvania since 2014. Officer Castellucci started his career in 2011 with the City of Reading Police Department in Berks County, Pennsylvania. In 2014 his career continued [as] a police officer with Douglass Township Police Department in Montgomery County, Pennsylvania. Officer Castellucci received training from the Berks County Berks County [sic] District Attorney's office as an Evidence Technician and has processed hundreds of crime scenes. Officer Castellucci is a graduate of the Pennsylvania Attorney General and Pennsylvania State Police Top Gun narcotics training course focused on narcotics investigations. Officer Castellucci has attended training by the Public Agency Training Council in the area of narcotics investigations. In addition, is [sic] a member of the Montgomery County Drug Task Force (Acting Department Drug Task Force Coordinator) and has attended yearly training with the Montgomery County Narcotics Enforcement Team Detective Bureau. Officer Castellucci has also worked in an undercover capacity with the Berk's [sic] County District Attorney's office in which I purchased narcotics resulting in a felony arrests [sic]. DUI enforcement training on standardized field sobriety. In addition, Officer Castellucci has

been involved in a wide variety of investigations gaining experience in the following aspects of law enforcement; criminal investigations, vehicle code enforcement, drug enforcement and search warrant application and execution. Officer Castellucci has also been involved in criminal investigations including, but not limited to; homicide, aggravated assault, assault, robbery, burglary, theft, DUI, Accident Reconstruction Level 1, and drug violations.

On August 12, 2022 at approximately 1628 hours, Douglass Township Police, Officer Castellucci, was dispatched to a vehicle accident with injuries at 1760 E. Philadelphia Avenue in Douglass Township, Montgomery County, Pennsylvania. . . .

While waiting for emergency medical services, Marian Kidd . . . stated she was driving normally east on E. Philadelphia Avenue when the black Hyundai Sonata drifted into her lane while traveling in the opposite direction. Kidd said she tried to avoid the collision by turning right but it was too late, and she was struck by the vehicle in the front driver side headlight area spinning her around landing her in the grass . . . ..[6]

. . . Before Reiseg left, Off. Castellucci spoke with her inside of the ambulance and asked what happened. Reiseg . . . stated she was headed to the Pottstown Walmart, but they were in the parking lot of the Weiss Supermarket. She then said that she wanted to pull over because she was tired but did not know where she was at. She then to repeat [sic] that she was unfamiliar with the area and was on her way to the Pottstown Walmart and wanted to stop driving because she was so tired. When specifically asked what happened leading up to the crash, Reiseg again started stating she was on the way to the Pottstown Walmart. When asked about what happened just before the crash, Reiseg said she was getting tired so she held [her passenger's] hand. She then woke up to the smell of the airbags and people running towards her vehicle. Throughout Off. Castelluci's [sic] training knowledge and experience as a police officer, he knows that individuals experiencing the end of a methamphetamine high get extremely tired and are unable to stay awake after being up for extended periods of time. Both Reiseg

---

[6] The affidavit of probable cause included statements from two witnesses who confirmed that Reiseg drifted into the opposite lane of travel and struck Kidd's vehicle.

and [her passenger] appeared to be methamphetamine users due to their personal appearance, which included disheveled clothing, poor personal hygiene and Reiseg's inability to accurately recall the incident that just took place. . . .

* * * *

Based upon the information provided, your affiant . . . requests permission to search for, and seize, any and all medical records for one, Haley Reiseg, for treatment on or about August 12, 2022, during her admission to Lehigh Valley Hospital, along with all documentation associated with these records . . . . The purpose for seizing the medical records would be to determine if Reiseg has any pre-existing medical condition which would contribute to this crash and will aid in this investigation in helping to determine if the driver was not capable of safe driving, in violation of Pa Vehicle Code 3802 (a)1, Driving under influence of alcohol or controlled substance.

*See* Exhibit C-1, Affidavit of Probable Cause, at 1-3.

Reiseg's argument that the affidavit of probable cause failed to establish a crime had been committed are misplaced. Reiseg suggests that the crash was a mere accident caused when she fell asleep, but the case on which she relies, **Lenhart**, is inapt. First, the legal issue in **Lenhart** involved the sufficiency of the evidence to sustain a conviction of homicide by vehicle while DUI beyond a reasonable doubt, not the less rigorous concept of probable cause. *See Lenhart*, 553 A.2d at 911 (reviewing whether there was proof, **beyond a reasonable doubt**, that a driver's intoxication caused an accident); **Rapak**, 138 A.3d at 672 (noting a review for probable cause is subject to less rigorous standards than trial issues). Second, in **Lenhart**, the accident occurred when the driver, who was intoxicated, fell asleep while driving at **2:00 a.m.**, when there was "a reasonable possibility that an absolutely sober motorist might doze off . . ., lose control of his car, and cause

an accident." ***Lenhart***, 553 A.2d at 912. In the present case, Reiseg fell asleep while driving in the middle of the afternoon at approximately ***4:30 p.m.*** ***See*** Exhibit C-1, Affidavit of Probable Cause, at 2. Thus, ***Lenhart*** is legally and factually distinguishable.

Furthermore, and contrary to Reiseg's suggestion that the affidavit failed to establish the existence of a crime, evidence of falling asleep while driving may establish a fair probability that a crime had been committed. As our Supreme Court has stated:

> Losing consciousness at the wheel differs in kind from the acts of momentary inadvertence or inattention that often occasion car accidents and are commonly encompassed in the term "negligence" in the tort arena. A momentary lapse leaves the driver unprepared for the unexpected or extraordinary. A loss of consciousness, on the other hand, leaves one totally unprepared even for the ordinary requirements for safe driving. Drivers have an unflagging duty either to remain vigilant and awake or to immediately desist from driving. . . .

***Commonwealth v. Huggins***, 836 A.2d 862, 869 (Pa. 2003) (concluding that the Commonwealth, when establishing a *prima facie* case of recklessness, may rely on the "facts of life" that falling asleep is preceded by warning signs and falling asleep while driving is at least negligent).

This Court has recognized that evidence that a driver fell asleep without warning and an opportunity to stop a vehicle may not constitute a voluntary act necessary for a conviction for homicide by vehicle. ***See Commonwealth v. Pedota***, 64 A.3d 634, 636 (Pa. Super. 2013). However, a driver has a burden at trial to prove sleep came without a warning and an opportunity to stop. ***See id***. Similarly, in ***Black***, this Court noted a "driver's failure to

- 12 -

perceive the substantial and unjustifiable risk posed when he or she drives with an increased likelihood of falling asleep constitutes a gross deviation from the standard of care that a reasonable person would observe in that actor's situation." ***Black***, 323 A.3d at 868 (internal citation omitted) (reasoning that the Commonwealth established a *prima facie* case of criminal negligence if an intoxicated driver fell asleep).

Put simply, our case law holds that falling asleep while driving itself may be evidence of a crime and a relevant factor in determining whether evidence is sufficient to meet a beyond a reasonable doubt standard, a *prima facie* case standard, or, as here, a probable cause standard, the least rigorous standard of the three. ***See Mendoza***, 287 A.3d at 462; ***Rapak***, 138 A.3d at 672. Thus, we discern no merit to Reiseg's initial argument that the affidavit of probable cause did not establish the existence of a crime.

We acknowledge Reiseg's further challenge based on the alleged lack of a nexus between Officer Castellucci's training and experience to his specific belief methamphetamine use contributed to the crash. ***See Commonwealth v. Thompson***, 985 A.2d 928, 935-36 (Pa. 2009) (noting that there must be "a nexus" between the officer's experience and the search, arrest, or seizure of evidence and that an officer's "training and experience abstract from an explanation of their specific application to the circumstances at hand" is not enough to make the officer's experience relevant in a probable cause determination). We further note Reiseg's citation to ***Commonwealth v. Randolph***, 151 A.3d 170 (Pa. Super. 2016), where this Court concluded an

affidavit of probable cause did not state a sufficient nexus to search a compartment welded to the undercarriage of a vehicle. *See Randolph*, 151 A.3d at 182-83.[7]

Assuming, without deciding, that Officer Castellucci's training and experience in narcotics investigations lacked a nexus to the specific and somewhat unusual inferences he drew in this case—*i.e.* not that Reiseg was intoxicated, but rather that she suffered extreme fatigue after using methamphetamines and staying awake for an extended period of time—no relief would be due.[8] However, our standard of review requires we review the

_____

[7] In *Randolph*, the affiant-officer stated: "Based on my training and experience[,] I recognized this modification to be a hidden compartment commonly used to transport guns, drugs and U.S. currency." *Randolph*, 151 A.3d at 183. In that case, we explained that the affiant-officer:

> failed to explain how his "training and experience" led him to recognize that the compartment was "commonly used to transport guns, drugs and U.S. currency." He neglected to list what classes he has attended or certifications he has received on this subject, the number or type of cases he has participated in where officers discovered hidden compartments containing drugs or weapons, or even how long he has been a law enforcement officer. Thus, his claim of "knowledge and experience" was an empty phrase that failed to tilt the scales toward probable cause.

*Id*. at 184; *see also id*. at 184 n.6 (suggesting that "it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search") (quoting LaFave, 2 Search & Seizure § 3.2(c) (5th ed. 2015).

[8] In the present case, unlike *Randolph*, the affidavit of probable cause for the records warrant contained a summary of Officer Castellucci's background. *See* Exhibit C-1, Affidavit of Probable Cause, at 1 (noting Officer Castellucci
*(Footnote Continued Next Page)*

affidavit of probable cause in a common-sense and non-technical manner. *See Mendoza*, 287 A.3d at 463. A court must also examine the information contained in the affidavit in the totality of the circumstances, not in piecemeal fashion. *See Commonwealth v. Boyd*, 296 A.3d 1270, 1277 (Pa. Super. 2023) (noting that a piecemeal assessment of the facts presented in an affidavit of probable cause runs counter to the totality of the circumstances review a magistrate must make).

Here, the affidavit provided information that Reiseg experienced extreme fatigue, while driving at 4:30 p.m., in the middle of an August afternoon, on what appeared to be a routine trip to Walmart. *See* Exhibit C-1, Affidavit of Probable Cause, at 1-2. She only recalled being at a parking lot of a Weis supermarket beforehand. She repeatedly stated "wanted to stop because she was so tired[,]" but did not do so because she was unfamiliar with the area. *Id*. at 2. The last thing she remembered before the crash was holding her passenger's hand because she was tired. *See id*. Reiseg provided Officer Castellucci with no reasonable explanation for experiencing such

_____

graduated from Top Gun and Public Agency Training Council courses in narcotics investigation, attended annual training with a county narcotics enforcement team, participated in—and was acting department coordinator of—a county drug task force, and worked undercover to facilitate felony arrests for sales of narcotics). Nevertheless, to the extent *Randolph* requires a more fact-specific nexus, it is unclear whether the affidavit of probable cause at issue here established a specific application of Officer Castellucci's training and experience to his belief that methamphetamines played a role in the crash.

- 15 -

extreme fatigue in the middle of the day, her decision to continue driving, or her spotty recollection of the events preceding the crash. As noted above, falling asleep behind the wheel is itself evidence of a crime, **see Huggins**, 836 A.2d at 869; **Black**, 323 A.3d at 868; **Pedota**, 64 A.3d at 636, and viewing circumstances set forth in the affidavit in their totality, we ultimately agree with the trial court that there was a substantial basis for the magisterial district judge to find probable cause that a crime had been committed and evidence of such crimes could be located in Reiseg's medical records.[9] Accordingly, we affirm the trial court's decision upholding the records warrant.

As to Reiseg's challenge to the validity of the blood warrant, she essentially asserts the illegality of the records warrant tainted the seizure of her blood sample, as well as the testing performed on that sample. **See** Reiseg's Brief at 25-28. Because, we have concluded there was sufficient probable cause to sustain the records warrant, Reiseg's "fruit of the poisonous tree" argument as to the blood warrant fails. **See Commonwealth v. Gatlos**, 76 A.3d 44, 63 (Pa. Super. 2013) (noting, "for evidence to be fruit of the poisonous tree, that evidence must be discovered as a result of an illegal

_____

[9] In light of Reiseg's unexplained and extreme fatigue on an apparent shopping trip in the middle of the afternoon, her spotty recollection of the events before the crash, there was a substantial basis for a magisterial district judge to discern a fair probability that Reiseg had used a substance that either acted as a depressant to promote an inability to stay awake, or was suffering from the aftereffects of extended use of a stimulant to stay awake for a prolonged time. "[I]n dealing with probable cause . . . [courts] deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." **Jacoby**, 170 A.3d at 1083.

search"). Thus, Reiseg's first issue challenging the validity of the records and blood warrants merit no relief.

In her second issue, Reiseg contends that the Commonwealth needed a separate, third, warrant to conduct forensic testing on her blood samples. Reiseg begins with the proposition that "blood tests . . . are a different matter." **See** Reiseg's Brief at 32 (quoting **Commonwealth v. Trahey**, 228 A.3d 520, 532 (Pa. 2020)). Collecting cases, including **Trahey**, **Commonwealth v. Shaw**, 770 A.2d 295 (Pa. 2001), **Commonwealth v. Reidel**, 651 A.2d 135 (Pa. 1994) and **Commonwealth v. Kohl**, 576 A.2d 1049 (Pa. Super. 1990) (*en banc*), Reiseg claims the testing of blood and the disclosure of the test result constitute a separate search from the seizure of her blood samples and, therefore, required a separate warrant. **See id**. at 32-35.

Reiseg further argues the trial court erred in rejecting her claim because, contrary to the trial court's analysis, the blood warrant approved by the magisterial district judge made no reference to testing. **See id**. at 35. Reiseg acknowledges the affidavit of probable cause for the blood warrant indicated the purpose of the warrant was "to aid in th[e] investigation in helping to determine if [Reiseg] was not capable of safe driving . . . by analyzing the blood at an approved laboratory (NMS Labs)." However, she asserts the affidavit did not cure the defect in the warrant. **Id**. at 35-36 (citing **Groh v. Ramirez**, 540 U.S. 551 (2004)).

The trial court denied relief on this issue and reasoned:

> During the course of their investigation, detectives sought a search warrant for the blood specimen taken by medical personnel for the purpose of submitting said sample to NMS labs for a toxicology report. As discussed,[10] the search warrant clearly stated that purpose. Accordingly, a separate warrant was not needed for the forensic analysis of [Reiseg's] blood; the blood sample had no purpose absent the forensic analysis.

Trial Court Opinion, 4/21/25, at 18-19. As noted by Reiseg, the court did not squarely address Reiseg's underlying claim that the blood warrant itself only authorized the seizure of her blood samples from the hospital. **Compare id**. **with** Reiseg's Second Amendment and Supplement to Motion for Suppression of Evidence, 4/9/24, at 1-2; Reiseg's Memorandum of Law, 4/18/24, at 15-17.

At the outset, we note that Reiseg is correct that neither the application nor approval of the blood warrant contained an express reference to testing her blood sample. **See** Exhibit C-2, Application for Search Warrant and Authorization, at 1. Instead, the application sought to seize her blood samples from the hospital, and the only reference to testing at NMS Labs was in the affidavit of probable cause.[11] **See id**., Application for Search Warrant and Authorization, at 1; **id**., Affidavit of Probable Cause, at 3.

_____

[10] This appears to be a reference to the trial court's determination that "[t]he affidavit [of probable cause for the blood warrant] clearly stated that the purpose of the seizure of the blood specimen was to have it forensically analyzed by NMS labs." Trial Court Opinion, 4/21/25, at 17-18.

[11] The application and authorization of the blood warrant read, in relevant part:

*(Footnote Continued Next Page)*

However, the cases cited by Reiseg do not support her specific claim that separate warrants are required to obtain a blood sample and to test the sample. *See **Commonwealth v. Hunte***, 337 A.3d 483, 517 (Pa. 2025) (holding that Pennsylvania's "implied consent" law, which authorized the taking and testing of blood absent any legitimate exception to the Fourth Amendment's warrant requirement, was unconstitutional); ***Trahey***, 228 A.3d at 527 (considering whether a warrantless blood draw conducted was justified by exigent circumstances); ***Shaw***, 770 A.2d at 299 (discussing the warrantless release of the result of a blood test taken for independent medical

---

**IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED *(Be as specific as possible)*:**

Items to be searched for are any and all tubes/vials containing the human blood of [Reiseg], drawn on or about August 12, 2022, as well as records and chain of custody documents associated with this blood.

**SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED . . .:**

The items to be searched for are being stored and preserved at HNL Lab Medicine – Lehigh Valley Health Network . . .

**NAME OF OWNER . . .:**

HNL Lab Medicine/[Reiseg]

**VIOLATION OF . . .:**

Driving under the influence of alcohol or controlled substance

Exhibit C-2, Application for Search Warrant and Authorization, at 1.

purposes); ***Riedel***, 651 A.2d at 138 (concluding a defendant has a reasonable expectation of privacy in his medical records); ***Kohl***, 576 A.2d at 1052 (holding a blood draw and test conducted at the request of police constituted a search). To the contrary, Pennsylvania courts historically have not required a separate warrant to conduct scientific testing upon physical evidence lawfully obtained by the Commonwealth. ***See Commonwealth v. Smith***, 164 A.3d 1255, 1275 (Pa. Super. 2017) (discussing DNA testing of clothing); ***accord*** LaFave, 2 Search & Seizure § 4.10(e) (6th ed.) (noting that "it is generally understood that a lawful seizure of apparent evidence of crime pursuant to a search warrant carries with it a right to test or otherwise examine the seized materials to ascertain or enhance their evidentiary value").

Nevertheless, the precise issue of whether another warrant was necessary to test Reiseg's blood after the police obtained and executed a warrant to seize it appears to occupy a gap in Pennsylvania law. The parties and the trial court have not cited a case on point, our criminal rules of procedure governing search warrants do not speak directly to the issue of testing, ***see*** Pa.R.Crim.P. 205,[12] and we have found no statute controlling this issue, ***compare*** 75 Pa.C.S.A. §§ 1547(a) (implied consent to "one or more

_____

[12] Rule 205 requires a warrant to identify specifically "the property" or "person" to be seized and to name with particularity the "person" or "place" to be searched. Except for a provision related to electronic storage media or electronically stored information, Rule 205 does not discuss further reviews of the contents of items seized pursuant to a warrant. ***See*** Pa.R.Crim.P. 205(b).

chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance"), 3755 (referred to as the emergency room counterpart to implied consent, which the *Hunte* Court found unconstitutional).

What is clear, however, is that merely categorizing a test as a "search" does not necessarily trigger a warrant requirement. *See Trahey*, 228 A.3d 520, 530, 533 (Pa. 2020) (distinguishing between breath and blood tests, both of which are "searches" within the meaning of the Fourth Amendment but noting breath tests do not require warrants). Moreover, courts in other jurisdictions have considered a similar issue, *i.e.*, whether a separate warrant is necessary to test a sample lawfully obtained under a prior warrant. For example, in *State v. Martines*, 355 P.3d 1111 (Wash. 2015), the Washington State Supreme Court reversed an intermediate appellate court ruling that drawing blood and testing blood constituted separate searches, each requiring particular authorization, and a warrant to draw blood did not authorize a test of the blood. *See Martines*, 355 P.3d at 1112. In reversing, the Washington Supreme Court reasoned:

> The warrant in this case authorized the "extract[ion]" of a blood sample from Martines, indicating probable cause existed to believe his blood contained evidence of DUI. The purpose of the warrant was to draw a sample of blood from Martines to obtain evidence of DUI. It is not sensible to read the warrant in a way that stops short of obtaining that evidence. A warrant authorizing a blood draw necessarily authorizes blood testing, consistent with and confined to the finding of probable cause. The only way for the State to obtain evidence of DUI from a blood sample is to test the blood sample for intoxicants.

The [intermediate appellate] court erred in concluding the warrant was fatally deficient. The warrant in this case was supported by probable cause to believe Martines's blood contained evidence of DUI. We apply a commonsense reading to the warrant and conclude it authorized not merely the drawing and storing of a blood sample but also the toxicology tests performed to detect the presence of drugs or alcohol.

\* \* \* \*

. . . [A] warrant authorizing extraction of a blood sample necessarily authorizes testing of that sample for evidence of the suspected crime.

*Id*. at 1115-16 (internal citations omitted). Our research, to date, has revealed no decision accepting a claim similar to Reiseg's.[13]

We need not adopt **Martines** here. It suffices to note that Reiseg carries a rather heavy burden of persuading this Court that the trial court erred in concluding a separate warrant to test was not required when the blood warrant authorized the seizure of her blood samples. **See Smith**, 164 A.3d at 1275. We conclude her arguments have not carried that burden.[14] Thus, we conclude Reiseg has not demonstrated an error in the trial court's conclusion

---

[13] Other courts have held testing may be conducted once the government lawfully obtains a sample. **See Jacobson v. State**, 603 S.W.3d 485, 490 (Tex. App. 2020) (collecting cases). One decision holding that testing was impermissible on an independently obtained blood sample was **Story v. Commonwealth**, 706 S.W.3d 263, 267 (Ky. 2024). Although that case stated testing a blood sample in the possession of the government required a valid warrant, the decision ultimately turned on state law that invalidated the warrant to test the sample. **See id**. 274.

[14] Because Reiseg has not established that a third warrant was necessary to test the sample obtained under the blood warrant, we need not address her argument based on **Groh**.

that a separate warrant was not needed for the forensic analysis of her blood, and her second issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/21/2026